UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

REGINA KAY FIALA,          )
                                    )
               Plaintiff,      )
                                      )
          v.               )      No.  4:15CV1501 CDP
                                      )
NANCY A. BERRYHILL, Acting   )
Commissioner of Social Security,[1]  )
                                      )
               Defendant.   )

## <u>MEMORANDUM AND ORDER</u>

Plaintiff Regina Kay Fiala brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the Commissioner's final decision denying her applications for disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401, *et seq.*; and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq.* Because the Commissioner's final decision is not supported by substantial evidence on the record as a whole, I will reverse the decision.

## I. Procedural History

On August 21, 2012, the Social Security Administration denied Fiala's July 2012 applications for DIB and SSI, in which she claimed she became disabled on

---

[1] On January 20, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security. Under Fed. R. Civ. P. 25(d), Berryhill is automatically substituted for former Acting Commissioner Carolyn W. Colvin as defendant in this action.

May 3, 2012, because of a bulging disc, herniated disc, bipolar disorder, anxiety, depression, numbness in arms and fingers, high blood pressure, neuropathy, migraines, and high cholesterol. At Fiala's request, a hearing was held before an administrative law judge (ALJ) on March 18, 2014, at which Fiala and a vocational expert testified. On June 5, 2014, the ALJ entered a written decision denying Fiala's claims for benefits, finding her able to perform work as it exists in significant numbers in the national economy. On September 8, 2015, after review of additional evidence, the Appeals Council denied Fiala's request for review of the ALJ's adverse decision. The ALJ's decision is thus the final decision of the Commissioner. 42 U.S.C. § 405(g).

In this action for judicial review, Fiala contends that the ALJ's decision is not supported by substantial evidence on the record as a whole. She argues that the ALJ improperly substituted her own opinion for the medical evidence of record and that the ALJ's assessment of her residual functional capacity (RFC) is not based on substantial evidence, which resulted in an improper hypothetical question being posed to the vocational expert. For the reasons that follow, Fiala's arguments are well taken. I will remand the matter for further proceedings.

## II. Evidence Before the ALJ

A. <u>Fiala's Testimony</u>

At the hearing on March 18, 2014, Fiala testified in response to questions

posed by the ALJ and counsel.

At the time of the hearing, Fiala was forty-one years of age.  She lives in a condominium with her disabled mother.  (Tr. 36.)  She stands five feet, eight inches tall and weighs 280 pounds.  (Tr. 40.)

Fiala worked as a hospital nurse from 1995 to February 2003.  From 2003 to January 2012, she worked as an RN/case manager in home health care.  During that time, she also worked for six months as an RN/assistant director at a nursing home, and for one year as director of nursing for private home care.  (Tr. 210.)

Fiala testified that she has a herniated disc in her thoracic spine that causes muscle spasms and a constant burning sensation in her back.  (Tr. 43.)  She has difficulty bathing and dressing because of her limited ability to bend over.  Her arms also go numb if she lifts them above her head for any length of time.  (Tr. 41-42.)  She testified that she can lift up to twenty pounds, stand for about two hours before needing to sit, and sit for about one hour without needing to change positions.  (Tr. 42-43.)  Fiala takes gabapentin, oxycodone, and morphine sulfate for pain, which reduces her pain from a level seven or eight to a level three.  The medication makes her extremely drowsy, and she naps every day because of this. Fiala testified that she took and was addicted to opiates while she worked and that, although she did not nap on the job, she would fall asleep while driving.  Fiala testified that her employer eventually sent her to get help.  (Tr. 44-46.)

Fiala testified that she also has had migraine headaches since she was a teenager and that she currently has them three or four times a month. The headaches can last from a few hours up to a day or two. She goes to bed when she has a migraine. (Tr. 48.)

Fiala testified that she also suffers from bipolar disorder and experiences manic and depressive states. She testified that she has been in a deep depressive state for the past year. She was hospitalized in May 2013 for suicidal ideation and currently has suicidal ideation on a weekly basis. She testified that she shuts down during these episodes and does not get out of bed or eat or sleep. She takes medication for the condition but feels it does not work. Fiala testified that her doctors have tried everything except electric shock therapy. (Tr. 46-48.)

As to her daily activities, Fiala testified that she does not do any cooking; her mother cooks. Fiala does light dusting and sweeping, and she folds laundry. (Tr. 42.) She is able to drive but has difficulty driving more than five miles. She does not drive as much as she used to. (Tr. 44.) Fiala testified that her sleep pattern is currently alright; she gets about six hours of sleep at night. (Tr. 46.)

B.    Vocational Expert Testimony

Delores Gonzales, a vocational expert, testified at the hearing in response to questions posed by the ALJ and counsel.

Ms. Gonzales classified Fiala's past work as a registered nurse and as a

private duty home health nurse as medium and skilled; as a director of nursing as sedentary and skilled; and as a charge nurse as light and skilled. (Tr. 50-51.)

The ALJ asked Ms. Gonzales to assume that Fiala was limited to medium work and "should avoid hazardous heights. The claimant is capable of reaching up to shoulder height. She should avoid reaching over shoulder height. She can frequently do stooping, kneeling, crouching and crawling. And she's limited to unskilled work as per her alleged mental impairment, and her continued use of opiates." (Tr. 51.) Ms. Gonzales testified that Fiala could not perform her past relevant work but could perform medium unskilled work as a dining room attendant or hand packager, and light unskilled work as a ticket taker or usher. (Tr. 51-52.)

Counsel asked Ms. Gonzales to assume that Fiala was limited to light work and would have three or more absences each month because of her mental illness. Ms. Gonzales testified that no jobs in the national economy would accommodate that rate of absenteeism. (Tr. 52.)

C.    Medical Records

Because the Regulations provide for the Commissioner to consider a claimant's medical history for at least the twelve-month-period preceding the month in which the claimant's application for benefits is filed, 20 C.F.R. §§ 404.1512(d), 416.912(d), I have reviewed Fiala's medical records for the twelve-

month period preceding July 2012.  I have also reviewed earlier medical evidence to place in context the effect of Fiala's impairments during the relevant period.

1. *Records dated before July 2011*

As the result of a motor vehicle accident, Fiala underwent anterior cervical discectomy and fusion in February 2002 to resolve herniated nucleus pulposus at the C4-5 and C5-6 levels.  Her discharge medications after the surgery included Oxycontin and Valium.  (Tr. 1104-05, 1147.)

In February 2003, Fiala was hospitalized for five days at St. John's Mercy Medical Center for depression and suicidal ideation.  Her history of chronic back pain was noted upon her admission.  She was diagnosed with major depressive affective disorder and was administered multiple psychotropic drugs and other medication, including muscle relaxants and opiate painkillers.  Upon discharge, Fiala was instructed to see a pain management specialist and participate in adult psychiatric care on an outpatient basis.  (Tr. 238-325.)  She was thereafter admitted to St. John's Mercy Edgewood Program/Behavioral Health for continuation of treatment and medication management.  (Tr. 328-65.)

In May 2004, Fiala was admitted to the emergency room at St. John's Mercy for headaches and eye pressure.  Her history of tension headaches, sinus headaches, and migraine headaches was noted.  Her history of depression and chronic neck pain was also noted.  Fiala was prescribed an antibiotic and Percocet

for sinusitis. (Tr. 380-94.) To resolve her chronic sinusitis, Fiala underwent surgery in June 2004 to correct a deviated septum. (Tr. 395-431.)

Fiala was admitted to St. John's Mercy Medical Center in October 2005 for escalating depression and anxiety. She reported that suicidal thoughts had become more intensive and she wanted to be admitted to a safe environment. Her current medications were noted to include Zoloft, BuSpar, Wellbutrin, Xanax, Restoril, and "double-strength" Vicodin. An adjustment to medication was planned, including a complete discontinuation of Xanax. (Tr. 918-22.)

Fiala was admitted to Center Pointe Hospital in August 2009 for psychiatric evaluation and for detoxification relating to oxycodone dependence. Fiala questioned why she was there because, while her objective was to get off pain medication, she claimed she had "true pain." Her current medications included clonidine, Robaxin, Cymbalta, nortriptyline, Zyprexa, lorazepam, Topamax, and Zanaflex. Fiala reported that she obtains relief with oxycodone. It was noted that Fiala had had two psychiatric hospitalizations since 2002 and that she had a history of anxiety and bipolar disorder, with her last manic episode occurring one year earlier. Fiala was diagnosed with opioid dependence and bipolar disorder. She was discharged six days later with instruction to continue with an outpatient treatment program. (Tr. 469-97, 544-45.)

During Fiala's outpatient treatment, it was noted that she was currently on

leave of absence from work because of increased symptoms of irritability, poor sleep, mood swings, and crying spells. She also had recently begun having migraines. (Tr. 533.) Fiala continued her outpatient treatment program through October 15, 2009. (Tr. 543.)

On October 20, 2009, Fiala was again admitted to Center Pointe for symptoms of depression, anxiety, low mood, somatic complaints, irritability, anger outbursts, feeling on edge, and poor impulse control. Fiala participated in therapy sessions and was discharged the following day. Her discharge medications were Cymbalta, Depakote, Lyrica, Zyrtec, nortriptyline, Singulair, Topamax, Zanaflex, Zyprexa, Ativan, and oxycodone. Her discharge diagnoses included bipolar disorder, opiate dependence, and chronic pain. (Tr. 527-28.)

Throughout this period, and specifically from February 2004 through March 2011, Fiala visited Dr. Steven Stromsdorfer, a psychiatrist, on no less than sixty-eight occasions for treatment of bipolar disorder. The severity of Fiala's condition waxed and waned over this period. Dr. Stromsdorfer prescribed numerous psychotropic medications and continually adjusted their dosage, given the transient nature of Fiala's impairment. (Tr. 813-32, 847-50, 866-916, 926, 930, 934-46.) These medications included BuSpar, Restoril, Zoloft, Xanax, Ambien, Wellbutrin, phenobarbital, Cymbalta, Rozerem, trazodone, Seroquel, Ativan, Zyprexa, nortriptyline, Halcion, and Abilify. (Tr. 752-60.) Fiala's treatment with Dr.

Stromsdorfer continued into the period relevant to the ALJ's determination of disability.

On May 23, 2011, Fiala visited Donna Waldo, a family nurse practitioner from her primary care physician's office, with complaints of fatigue, bipolar disorder, anxiety, acute onset of migraine headaches, and a six-year history of back pain aggravated by movement. She reported that she currently had back pain, anxiety, and depression. FNP Waldo noted Fiala's medications to include Cymbalta, Xanax, Flexeril, Percocet, Abilify, and Halcion. Physical examination was unremarkable. Fiala was instructed to continue with her current medications. (Tr. 1044-47.)

On June 28, 2011, Fiala visited Dr. Stromsdorfer who noted her to be depressed and stressed. Her current medications were Cymbalta, Halcion, Xanax, and Abilify. Dr. Stromsdorfer observed Fiala to be dysphoric and to have a depressed and anxious mood and affect. She had no suicidal ideation. Dr. Stromsdorfer noted Fiala's bipolar disorder to have worsened and that she also experienced gastrointestinal and headache symptoms. Dr. Stromsdorfer instructed Fiala to increase her dosages of Xanax and Cymbalta. (Tr. 600.) On that same date, FNP Waldo instructed Fiala to continue with her current treatment regimen regarding all of her impairments. (Tr. 1040-43.)

2.     *Records dated July 2011 through June 2012*

Fiala visited her primary care physician, Dr. Brij Vaid, on July 15, 2011, with complaints of migraine headaches.  She was in no acute distress. Examination of the cervical spine was unremarkable, with Fiala exhibiting no pain and complete range of motion.  Normal mobility about the back was noted. Musculoskeletal examination was normal in all respects.  Fiala denied having any type of disability, including psychiatric symptoms.  Dr. Vaid noted Fiala's mental and emotional status to be within normal limits.  Dr. Vaid diagnosed Fiala with back disorder, for which she was taking Percocet; hypertension, for which she was taking Norvasc; migraine headaches, for which she received Sumavel injections; fatigue, for which she was taking Nuvigil and used a CPAP; and mental disorder, for which she was instructed to continue with psychiatric treatment.  (Tr. 740-73.)

Fiala returned to Dr. Stromsdorfer on July 18, who observed her to be dysphoric and tearful.  Dr. Stromsdorfer rated Fiala's depression at 10/10 and her anxiety at 10/10.  Fiala was instructed to increase her Cymbalta and to maintain her other medications as prescribed.  Dr. Stromsdorfer  assigned a GAF score of 55. (Tr. 599.)  On July 25, Dr. Stromsdorfer noted that Fiala tolerated the medication adjustment.  Fiala continued to complain of mood swings, but she had improved. Dr. Stromsdorfer rated Fiala's depressed and anxious moods at 4/10 and assigned a GAF score of 60.  Fiala was instructed to continue on her medication as currently

prescribed. (Tr. 598.)

Fiala returned to Dr. Vaid on July 27 for follow up of her migraines, hypertension, bipolar disorder, and anxiety. Fiala had been noncompliant with her hypertension medication, and she experienced visual disturbances. She reported her migraines to be getting worse. Examination showed no change from her earlier exam. Fiala was continued on her medications. (Tr. 735-38.) Fiala visited her primary care physician's office six more times during the remainder of 2011. No changes in Fiala's condition were noted during these visits; nor were there any changes in treatment. (Tr. 698-705, 708-15, 718-21, 731-34.)

On August 12, Dr. Stromsdorfer noted Fiala's dysphoria to be worse, and her depressed and anxious moods were 10/10 again. Klonopin was added to her medication regimen and, ten days later, Dr. Stromsdorfer noted that she had improved, was less dysphoric, and had a calm effect. (Tr. 596-97.) Fiala visited Dr. Stromsdorfer on four more occasions through October. Her depression and anxiety levels continued to be high, but Dr. Stromsdorfer noted that she was doing better. No additional changes to Fiala's treatment regimen were made during this period. (Tr. 589-92.)

On January 26, 2012, Fiala visited a new primary care physician, Dr. Salma Mannan-Hilaly, for follow up of her hypertension, migraine headaches, neck pain, bipolar disorder, vitamin D deficiency, and obesity. Dr. Mannan-Hilaly noted

Fiala to be taking metoprolol, Sumavel, Flexeril, Percocet, Cymbalta, Abilify, and Xanax for her conditions. Fiala was working on diet and exercise for her obesity. Fiala reported having chronic neck pain and irritability with mood changes associated with chronic bipolar disorder, but examination was unremarkable. Fiala was continued on her current treatment regimen. (Tr. 694-97.) On February 22, Soma was prescribed. (Tr. 679-81.)

Fiala visited Dr. Mannan-Hilaly on March 22 for follow up. Physical examination was unremarkable. Dr. Mannan-Hilaly noted Fiala's major depressive disorder to be in full remission. Fiala was instructed to continue with her medications. (Tr. 675-78.)

Fiala injured her back on March 28, 2012 while lifting a patient at work. She experienced shooting pain and tightness in her neck for which she took her "personal medication," Soma and Percocet. Physical examination on March 30 showed limited range of motion about the cervical spine on turning and bending, with sharp pain shooting to the left shoulder. Spurlings test was positive on the left. No spasm, swelling, or tenderness was noted. Examination of the left shoulder was unremarkable. Dr. Adonis D. Bernardo diagnosed Fiala with moderate cervical radiculopathy, moderate cervical strain, and moderate trapezius strain. She was advised to take her personal medications as needed but not to take them while at work. Activity was encouraged. Physical therapy was considered.

(Tr. 615-17.)  On April 3, Fiala was doing much better.  Range of motion about the cervical spine continued to be decreased but without pain.  Tenderness was noted about the trapezius.  Range of motion about the shoulder and trunk was normal.  Fiala was instructed to continue with her medications.  (Tr. 613-14.)

On April 11, Fiala participated in physical therapy after which she was released from care to return to regular duty.  (Tr. 581, 586.)  Physical examination that same date showed full range of motion about the cervical spine, with no pain or tenderness.  Dr. Bernardo noted no tightness or spasm.  It was noted that Fiala was able to work her regular duty with no problems and no pain.  She had stopped taking her medication because her condition had improved.  She was diagnosed with cervical strain, improved.  (Tr. 606-07.)

Fiala returned to Dr. Mannan-Hilaly on April 12, who noted her to be experiencing headaches as a result of increased blood pressure.  Fiala reported being anxious, stating that she was under increased stress because her parents were ill.  She also continued to complain of chronic pain but denied any other musculoskeletal complaints.  Physical examination was unremarkable.  She was continued on her medications.  (Tr. 671-74.)

Fiala visited Dr. Stromsdorfer on May 3, 2012, who noted that Fiala had recently been terminated from her job.[2]  Fiala's medications included Cymbalta,

_____

[2] She was terminated on May 3, 2012, for failure to satisfactorily meet job requirements.  At the

Xanax, Abilify, and hydrochlorothiazide. Fiala was dysphoric, and she displayed a depressed and anxious mood and affect. Dr. Stromsdorfer instructed her to increase her Xanax and to continue with her other medications. Dr. Stromsdorfer assigned a GAF score of 50. (Tr. 575.) Dr. Stromsforfer saw Fiala four more times during the month of May, during which time he continued to adjust her medications. While Fiala continued to be depressed, anxious, and dysphoric, Dr. Stromsdorfer noted her to be doing better, albeit fair. Dr. Stromsdorfer noted that Fiala had begun taking Percocet, and he prescribed Trazodone to help her sleep. At the end of the month, Dr. Stromsdorfer assigned a GAF score of 65. (Tr. 571-74.)

In the meanwhile, Fiala followed up with Dr. Mannan-Hilaly and underwent diagnostic testing for continued back pain. An MRI of the thoracic spine dated May 10 showed disc herniation at the T7-8 level, resulting in ventral cord flattening and indentation, but no central canal stenosis overall. No foraminal stenosis was visible at any level. An MRI of the cervical spine showed anterior decompression and solid appearing fusion at C4-5 and C5-6, but no residual central canal or foraminal stenosis was observed at those levels. Circumferential disc bulge was noted at C6-7, resulting in moderate foraminal stenosis but no central canal stenosis. (Tr. 577-79.) On May 14, Dr. Mannan-Hilaly prescribed Naprosyn

time, she was in her probationary period as a registered nurse for the department of mental

for cervicalgia.  (Tr. 996-1003.)

Fiala thereafter went to Grace Hill Health Centers for evaluation of disc disorder of the cervical spine and of the thoracic spine, depression, bipolar disorder, other chronic pain, and idiopathic peripheral neuropathy.  Her medications were noted to include Abilify, Cymbalta, alprazolam, oxycodone, metoprolol, and topiramate.  Fiala was in pain and had decreased range of motion about the neck.  Examination showed tenderness and severe pain with motion about the cervical spine; tenderness and moderate pain with motion about the thoracic spine; and tenderness and mild pain with motion about the lumbar spine. Fiala was referred to ConnectCare orthopedics and neurology for evaluation and treatment of severe neck and thoracic spine pain, T7-8 disc herniation, and neuropathic pain.  (Tr. 648, 650-55.)

Fiala returned to Dr. Stromsdorfer on June 13 who noted that she was doing pretty well.  Fiala reported that Trazodone and Xanax helped her sleep.  She was depressed and calm, and Dr. Stromsdorfer noted her depression and anxiety to be at low to medium levels.  (Tr. 570.)

On that same date, June 13, Fiala returned to Dr. Mannan-Hilaly who noted that Fiala no longer took Percocet and was taking only naproxen for her neck pain. Physical examination was unremarkable.  Dr. Mannan-Hilaly instructed Fiala to

---

health.  (Tr. 587.)  This date, May 3, 2012, is Fiala's alleged onset date of disability.

continue with her medications for her impairments, including Flexeril and Percocet for cervicalgia. (Tr. 661-64.)

On June 27, Dr. Stromsdorfer noted Fiala's condition to have worsened. She was dysphoric and tearful and reported that she was applying for SSI benefits. Dr. Stromsdorfer noted her level of depression and anxiety to be high, and he increased her dosage of Trazodone. A GAF score of 60 was assigned. (Tr. 569.)

3. *Records dated July 2012 and after*

On July 18, 2012, Dr. Stromsdorfer determined that Fiala was not doing any better. He started her on Zoloft, noting that the medication had helped her years ago. (Tr. 568.)

On August 20, Kyle DeVore, Ph.D., a psychological consultant with disability determinations, completed a Psychiatric Review Technique Form and Mental RFC Assessment in which he opined that Fiala's major depressive disorder and bipolar disorder caused mild restrictions in activities of daily living; mild difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence, or pace; with no repeated episodes of decompensation of extended duration. Upon his review of the evidence of record, Dr. DeVore concluded that Fiala could perform at least simple, repetitive tasks on a sustained basis. (Tr. 58-59, 62-64.)

Fiala underwent an independent medical examination on January 17, 2013,

for evaluation of her complaints of pain.  Fiala reported having continued neck pain, radiating pain, and numbness in her arms since her March 2012 workplace injury.  She reported that treatment for hypertension helped her headaches but that she continued to have neck and mid-back pain.  She also reported that she began having lumbar back pain in December 2012, which radiated to her thighs and calves, and that the pain was aggravated by prolonged sitting and prolonged standing.  Dr. Russell C. Cantrell, an orthopedist, noted Fiala's history of anxiety and depression and noted her current medications to include Trazodone, Xanax, Zoloft, Abilify, hydrocodone, and oxycodone, with a recent increase in hydrocodone dosage.  Physical examination showed Fiala to stand five feet, seven inches tall and weigh 275 pounds.  She had active range of motion about the cervical spine, with mild limitation in extension and no specific pain complaints. She had full forward flexion and mildly limited side-bending.  Rotation was moderately limited with no specific increase in pain complaints.  Full range of motion of both shoulders was noted, but with complaints of pain.  Tenderness was noted about the trapezius and scalene muscles and the thoracic paraspinals, but no cervical paraspinal spasms were noted.  Fiala had normal strength and reflexes in the upper and lower extremities with full range of motion about the lumbar spine. Straight leg raising was negative.  X-rays of the lumbar spine were unremarkable. Upon review of the records available to him, Fiala's report, and physical

examination, Dr. Cantrell opined that Fiala's subjective complaints of pain were not related to the March 2012 injury, that she had reached maximum medical improvement, and that she was capable of performing regular duty activities without restrictions. (Tr. 1165-68.)

Fiala underwent another independent medical examination on April 18, 2013, in relation to her March 2012 injury. (Tr. 1217-28.) Dr. David T. Volarich detailed Fiala's medical history. She currently complained of ongoing neck pain, stiffness, and restricted motion. She also reported having a constant headache, which increases when her neck pain increases. She reported that stress worsens the pain. She also reported having constant mid-back pain and soreness, and numbness in her arms if she raises them above her head. She reported that she can bend, twist, push, and pull but with some difficulty. She reported that she can lift up to two gallons of milk, can stand and walk without too much difficulty, and can sit for about ninety minutes. Fiala's current medications were Zoloft, metoprolol, Xanax, Trazodone, Norco, Flexeril, and ibuprofen. Mental status examination showed Fiala to be severely depressed with a flat affect. Dr. Vorich noted her facial expressions to be fixed. She did not smile, and she spoke in a monotone. She was cooperative and fully oriented.

Dr. Volarich conducted a physical examination, which showed Fiala to stand five feet, seven inches tall and weigh 280 pounds, with a BMI of 43.8. She had

full strength in all extremities. Her gait was normal in all respects. She was able to squat and stand back up without difficulty. Musculoskeletal exam showed Fiala to have limited range of motion with pain about the cervical spine, thoracic spine, and lumbar spine. No spasms were noted. A trigger point was noted in the left trapezius muscle. Upon review of Fiala's complaints, the medical records from Fiala's treatment and exams, and his own physical examination, Dr. Volarich diagnosed Fiala with thoracic central disc herniation T7-8 without radicular symptoms; mild aggravation of cervical syndrome; cervical left arm radiculopathy secondary to disc herniation C4-5 and C5-6, status post anterior cervical discectomy with fusion and instrumentation; cervical post-laminectomy syndrome with persistent headaches, neck pain, and left trapezius/shoulder girdle radicular symptoms and myofascial pain; chronic lumbar syndrome; and multiple psychiatric disorders.

Dr. Volarich opined that Fiala's disabilities were a hindrance to her employment and recommended that she undergo vocational evaluation to determine whether she could return to the open labor market in any capacity in the future. He also opined that Fiala would require ongoing care for pain syndrome but would not benefit from surgical intervention. He noted that she is able to perform most self-care activities, but recommended that she avoid all bending, twisting, lifting, pushing, pulling, carrying, and climbing, and limit all other similar

tasks to an as-needed basis.  He further recommended that she not handle any weight greater than twenty pounds, and limit this task to an occasional basis; not handle weight over her head or away from her body, nor carry weight over long distances or uneven terrain; avoid remaining in a fixed position – both sitting and standing – for more than thirty minutes; change positions frequently and rest when needed; and pursue an appropriate stretching, strengthening, and range of motion exercise program in addition to non-impact aerobic conditioning.

Fiala went to the emergency room at Mercy Hospital on May 7 with complaints of chronic right arm pain and finger numbness that had worsened the previous week.  She reported that Flexeril, Vicodin, Skelaxin, and Neurontin did not provide relief.  Examination showed tenderness about the right trapezius and paraspinous muscles.  Spasms were also noted about the right trapezius.  An x-ray of the cervical spine showed mild degenerative changes at the C6-7 level.  Fiala was diagnosed with radiculopathy and was instructed to continue with Flexeril.  An NSAID was also prescribed.  (Tr. 1177, 1185-89, 1195.)

While at Mercy, Fiala also reported having suicidal thoughts and that she had been making suicidal statements for two weeks.  Fiala was tearful, and her mother reported to hospital personnel that she and Fiala's father had tried everything but that Fiala was not sleeping or eating and had lost interest and motivation.  Fiala reported that her pain contributed to her depression, and her

mother reported that Fiala might kill herself if she did not obtain relief from her pain.  Mental status examination showed Fiala to be anxious with a depressed mood and blunted affect.  She was noted to have negative and depressive thoughts but no current suicidal or homicidal ideations.  Insight and judgment were limited. Fiala was admitted to Behavioral Health with a diagnosis of recurrent major depressive disorder and a GAF of 45-50.  She participated in individual and group therapy and was treated with multiple medications, including Thorazine, Norco, Flexeril, Neurontin, Levaquin, Lopressor, and Zoloft.  She was discharged on May 10 in stable condition with her prognosis noted to be fair.  Her GAF at discharge was 55.  (Tr. 1178, 1181-84, 1190-94.)

Fiala visited Dr. Aunita Hill on May 28, 2013, to establish care for her various impairments.  It was noted that Fiala recently obtained medical insurance and was applying for disability benefits.  Dr. Hill noted Fiala's recent medical history.  Examination of the neck and cervical spine showed tenderness to palpation.  Pain was also noted about the right elbow, and Fiala was wearing a sling on her right arm.  Fiala's current medications were Cymbalta, Xanax, metoprolol, Trazodone, gabapentin, Norco, and nabumetone.  Dr. Hill instructed Fiala to continue with Norco for neck pain, and she referred Fiala to the Advanced Pain Center for pain management.  Dr. Hill increased Fiala's gabapentin dosage for right arm numbness.  She also instructed Fiala to follow up with a psychiatrist for

her bipolar disorder, for which it was noted that Fiala took Cymbalta and Zoloft. (Tr. 1202-04.) A follow up MRI of the cervical spine showed disc herniation at the C6-7 level, which correlated to right C7 radiculopathy. (Tr. 1200-01.)

On June 6, Fiala underwent a psychological and vocational rehabilitation evaluation in relation to a worker's compensation claim. (Tr. 1205-16.) Fiala reported to psychologist Vincent F. Stock, M.A., that she could not work because of constant pain radiating from her neck to her hand, cervical strain from a bulging or herniated disc at C6-7, a herniated disc at T7-8, poor attention and concentration from anxiety and depression related to her bipolar disorder, migraine headaches, and poor sleep. She reported that her current medications did not help. Fiala reported her daily activities to include watching television, caring and shopping for her parents, doing laundry, visiting her aunt, cooking, and playing cards or bingo. She is able to drive and drives five to seven days a week. Mental status examination showed Fiala to be cooperative but with agitated motor activity. Her mood was depressed and her affect was flat. She reported having symptoms of both anxiety and depression but stated that she felt more depressed. Her speech was soft and pressured, and she had poor eye contact. Mr. Stock noted Fiala's thought processes to be intact. She had no hallucinations or delusions but reported having frequent suicidal thoughts. She was fully oriented to time and place, and her general knowledge was intact. She reported having impaired memory. Mr.

Stock considered Fiala's insight and judgment to be impaired given that she was overwhelmed by her current circumstances.

Mr. Stock diagnosed Fiala with bipolar disorder and assigned a GAF score of 45. He concluded that Fiala had experienced significant depression and anxiety since March 2012 and had reached maximum psychological improvement. He opined that Fiala had moderate impairments in social functioning, activities of daily living, concentration, and adaptation. He further opined that Fiala would have significant difficulty in her ability to maintain and hold a full time job given her level of pain, interference from bipolar disorder, and need to be on significant pain and psychotropic medications. He further opined that the combination of Fiala's physical and mental limitations would render her totally and permanently disabled. In a letter dated July 3, 2013, Dr. Volarich concurred in Mr. Stock's opinion. (Tr. 1229.)

Fiala visited Dr. Naheed Bashir at the Missouri Spine and Pain Management Center on August 22 with complaints of neck and arm pain with associated numbness. She also reported having migraine headaches. Fiala had decreased range of motion about the cervical spine with paraspinal tenderness. She had normal strength in all extremities. It was noted that Fiala recently had injections to the neck but obtained minimal relief. She was referred to a neurosurgeon. (Tr. 1260-61.)

Fiala began treatment at BJC-BH Community Mental Health Center on August 26 with admitting diagnoses of generalized anxiety disorder and bipolar I disorder, most recent episode depressed, severe without psychotic features. Her GAF upon admission was 38. Fiala reported having suicidal thoughts on a weekly basis and that she angers easily and quickly. Fiala reported feeling continually angry and that others sometimes feel threatened by her verbal aggression. She reported feeling worthless and hopeless and that she has racing thoughts. She reported having manic symptoms about three times a month and panic attacks three to four times a week. A treatment plan was developed with a case manager and psychiatrist, with such treatment to involve medical and counseling interventions. It was noted that Fiala's community support specialist would accompany her to all appointments to assist in fully understanding the provider's recommendations. (Tr. 1356-59.)

Fiala followed up with Dr. Bashir on September 12 and reported that her pain had worsened. She asked for another injection. Dr. Bashir diagnosed Fiala with degenerative disc disease, post-laminectomy syndrome, radiculopathy, and cervicalgia. (Tr. 1259.) X-rays of the lumbar spine taken that same date showed articular facet degeneration at L4-5, L5-S1, and possibly L3-4. No obvious findings of disc degeneration or of any destructive pathology were noted. (Tr. 1232.)

Fiala returned to Dr. Bashir on September 19 and complained of severe low back pain radiating into the right leg. She had decreased range of motion on the left. (Tr. 1258.) An MRI of the lumbar spine yielded negative results. (Tr. 1231.) A steroid injection was later administered to the right sacroiliac joint in response to complaints of increased pain on the right side of her low back. (Tr. 1238-40.)

On September 23, Fiala visited Dr. Moitreyee Reddy, a psychiatrist at BJC Behavioral Health, for psychiatric evaluation. Fiala was currently taking Cymbalta, Klonopin, and Trazodone. She reported struggling with depression and anxiety on and off for fifteen years but that her depression had been unrelenting and was now "off the charts." She reported feeling hopeless and having occasional crying spells. She reported that she could not shut down her mind at night and had disturbed sleep. Fiala reported her appetite, interests, focus, and energy level to be low, and that being with her daughters did not mitigate her depression. She had excessive guilt. She did not have current suicidal ideations. As to her anxiety, Fiala reported having panic-like symptoms once or twice a day, at which time she takes her Klonopin. Fiala reported that she felt that her pain and anxiety were linked and feed off of each other. She reported that she angers easily and is often irritable because of her symptoms. Fiala reported having manic symptoms a couple of times a year, with high energy, racing thoughts, and impulsive behaviors. She reported dealing with daily pain and that her pain improves to a level four

when she takes Dilaudid. Dr. Reddy noted Fiala to also be taking methylprednisone, metoprolol, gabapentin, Skelaxin, Percocet, and Sumavel injection for migraines. Dr. Reddy observed Fiala to be a bit sedated because of her medications. Mental status examination showed Fiala to be fully oriented. She made good eye contact and was pleasant and cooperative. Dr. Reddy noted Fiala's gait to be stiff and her movements to be slow secondary to pain and stiffness. Fiala's mood was sad and her affect was depressed. She was often tearful. She denied current suicidal or homicidal ideation. Fiala's thoughts were linear and goal oriented. She had fair insight into her mental and physical health problems and need for treatment. Dr. Reddy considered her judgment to be intact given that she was seeking medical care and continuation of her medications. Dr. Reddy diagnosed Fiala with bipolar disorder and generalized anxiety disorder. Panic disorder was to be ruled out. A GAF score of 45 was assigned. Dr. Reddy instructed Fiala to continue with Cymbalta and Trazodone. She was also to continue with Klonopin, but was instructed to be cautious in its use and not to operate heavy machinery or do fine motor tasks while taking the medication. Lithium was prescribed for depression. Fiala was instructed to participate in psychotherapy and to follow up in one month. (Tr. 1335-39.)

On October 10, Fiala complained to Dr. Bashir that she obtained no relief from the last injection and that she went to the emergency room the night before

for severe low back pain.[3]  Dr. Bashir diagnosed Fiala with lumbar spondylosis, and he administered a bilateral facet joint injection that same date.  (Tr. 1253-55.)

Fiala visited Dr. Hill on October 14 and reported that she could not walk the previous week because of pain and that she went to the emergency room where she was treated like a drug-seeker.  Fiala reported that she received an injection, which helped on the left side, but that she continued to have a lot of pain on the right.  Dr. Hill adjusted Fiala's current medications and noted that hydromorphone, lithium, and clonazepam had been added to her treatment regimen.  (Tr. 1285-87.)

Fiala returned to Dr. Reddy on October 21 and reported continued high depression with regular crying spells.  She questioned whether lithium helped and reported that she has had more wakefulness at night because of her need to use the bathroom.  She also reported having high anxiety but denied any manic symptoms.  Fiala had passive suicidal thoughts related to her pain, but no plan or intent.  Mental status examination showed no change from the previous exam.  Dr. Reddy continued Fiala in her diagnoses and instructed her to decrease Trazodone and to start Ambien.  Fiala was continued on her other medications, including lithium.  (Tr. 1340-42.)

On October 23, Fiala reported to Dr. Bashir that the lumbar block helped and that she now experienced pain at a level six instead of at a level ten.  She

---

[3] There is no record of this emergency room visit in the administrative transcript.

complained of mid-back pain. A thoracic epidural injection was administered for thoracic radiculopathy. (Tr. 1250-52.)

Fiala returned to Dr. Hill on November 18 with complaints of daily migraine headaches and associated nausea. Noting that insurance no longer covered the medication that was effective for the condition, Dr. Hill prescribed Topamax and Imitrex. (Tr. 1300-04.)

Fiala also returned to Dr. Reddy on November 18 and reported some benefit from lithium. She denied excessive crying but reported having irritable moods. She denied any mania, psychosis, or panic. She reported having disturbed sleep in that she wakes every two hours. Fiala had no energy or motivation to do things outside the home, but she enjoyed spending time with her children, which distracted her and helped her function better. She denied any thoughts of self-harm. Fiala was continued on Cymbalta, Klonopin, and Ambien, and her dosage of lithium was increased. (Tr. 1343-45.)

On November 20, Fiala reported to Dr. Bashir that a neurosurgeon recommended traction for her neck condition.[4] She reported that her pain medications did not help and she requested an increase in their dosage. Another thoracic epidural injection was administered that same date. (Tr. 1247-49.)

Fiala returned to Dr. Hill on December 2 and reported that she was

---

[4] The administrative transcript does not contain a record of Fiala's visit with a neurosurgeon.

experiencing worsening depression. Fiala was instructed to continue on her current medications and to follow up with her psychiatrist in the next week or two. A licensed counselor was contacted regarding insurance coverage. (Tr. 1309-11.)

On December 11, Fiala reported to Dr. Bashir that Percocet no longer helped but that the injection continued to help her mid-back pain. She reported her current pain to be at a level five. Examination showed Fiala to continue to have decreased range of motion. She was instructed to increase her dosage of hydrocodone. (Tr. 1246.)

Fiala returned to Dr. Reddy on December 16 who noted Fiala to be sedated given the increased dosage of oxycodone. Fiala reported that she continued to be depressed with occasional crying spells. She also had poor energy and low appetite. She denied panic and reported regularly taking Klonopin to decrease her anxiety. She denied thoughts of self-harm. Dr. Reddy increased Fiala's dosage of lithium and instructed her to continue with Cymbalta and Klonopin as prescribed. Fiala was instructed to stop Ambien given the sedating effect of her increased pain medication. (Tr. 1346-48.)

On January 24, 2014, Fiala reported to Dr. Reddy that she stopped taking lithium because she was trying to minimize her medications. Dr. Reddy also noted that Fiala had experienced severe nausea with the increased dose of lithium. Fiala continued to take Cymbalta and Ambien but reported having severe depression

with continuous crying. She also reported having anxiety and memory issues and that she was nearly unable to function. She denied having suicidal ideation but felt helpless. Mental status exam showed Fiala to be tearful and distraught and to have poor eye contact. Her mood was "very bad" and her affect was tearful. Insight and judgment continued to be fair. Fiala did not want to restart the lithium because of its side effects. Dr. Reddy prescribed Zoloft. Fiala was continued on Cymbalta and Klonopin and was instructed to discontinue Ambien. (Tr. 1349-51.)

Fiala was admitted to the emergency room at St. Anthony's Medical Center on February 14 with complaints of low back pain with a recent onset of numbness in the legs. Hospital personnel noted that Fiala took morphine, oxycodone, and Neurontin for pain. Physical examination showed Fiala to be stiff, uncomfortable, and tearful. She had an antalgic gait and limited range of motion about the back with pain. Tenderness was noted about the lumbar spine to the lumbar sacral joint. She had normal reflexes and normal strength. Fiala was diagnosed with low back pain and abdominal pain and was transferred to Missouri Baptist Medical Center, where she was admitted. (Tr. 1265, 1270-77.)

An MRI of the lumbar spine taken at Missouri Baptist that same date showed bilateral joint hypertrophy at the L4-5 level with disc bulge, but with normal canal. At the L5-S1 level, there was a small posterior central disc protrusion with mild bilateral facet joint hypertrophy, with normal canal. There

were no abnormal areas of enhancement, no acute abnormality, and no evidence of epidural abscess. An MRI of the thoracic spine showed disc protrusion and disc bulge at T7-8 resulting in mild canal stenosis, but was otherwise normal. (Tr. 1262-64.) Fiala was given Celebrex. She was discharged on February 18 with instructions to continue with Celebrex and the following medications: Ambien, Cymbalta, Imitrex, Klonopin, Neurontin, Topamax, Zanaflex, Zoloft, HCTZ, metoprolol, morphine, and oxycodone. (Tr. 1270-77.)

Fiala returned to Missouri Baptist on March 5 for reasons not indicated in the record. She was discharged on March 6. I note that upon discharge, her prescribed daily dosage of morphine had increased when compared to her last hospitalization, and prednisone had been added to her medication regimen. (Tr. 1278-82.)

### III. Additional Evidence Considered by the Appeals Council

The Appeals Council considered medical records from Mercy Hospital dated March 18 to 24, 2014, in its determination to deny Fiala's request for review. I must consider this additional evidence in determining whether the ALJ's decision is supported by substantial evidence. *Frankl v. Shalala*, 47 F.3d 935, 939 (8th Cir. 1995); *Richmond v. Shalala*, 23 F.3d 1441, 1444 (8th Cir. 1994).

Fiala was admitted to the emergency room at Mercy Hospital on March 18, 2014, with complaints of increased depression. It was noted that Fiala had her

disability hearing that same date, after which she told her mother that she would rather die than continue with her pain. Her history of chronic pain and treatment was noted. Fiala reported her pain to be increasing quickly and that she obtained no relief with increased dosages of pain medication. Fiala's current medications were noted to include morphine, Zanaflex, Cymbalta, Klonopin, Ambien, Topamax, Thorazine, Neurontin, Zoloft, Relafen, Norco, Medrol, Flexeril, Levaquin, and Imitrex. Physical exam showed Fiala to be morbidly obese. She had normal range of motion about the neck. She was alert and oriented in all spheres. Her insight and judgment were normal, and her recent and remote memory was intact. Fiala was given morphine and was admitted to the hospital for further treatment for depression. Her admitting diagnosis was depression, with a GAF score of 51-60. She was treated with Lamictal during her hospitalization, which she tolerated well. Fiala was discharged on March 21 with a diagnosis of recurrent major depressive disorder. Mental status upon discharge was unremarkable. Her mood was good and her affect was appropriate. Her GAF remained 51-60. She was discharged in stable condition with fair prognosis. Her discharge medications were: Klonopin for anxiety; Cymbalta and Zoloft for depression; Neurontin, Norco, MS Contin (morphine), oxycodone, and prednisone for pain; Imitrex and Topamax for migraine headaches; Zanaflex for muscle spasms; and Ambien for sleep. She was instructed to follow up with Dr. Reddy

and to continue attending weekly therapy sessions.  (Tr. 1367-89.)

Fiala submitted additional medical records to the Appeals Council, dated August 12, 2014, through January 12, 2015.  The Appeals Council did not consider these records, stating:  "The Administrative Law Judge decided your case through June 5, 2014.  This new information is about a later time.  Therefore, it does not affect the decision about whether you were disabled beginning on or before June 5, 2014."  (Tr. 2.)

## IV.  The ALJ's Decision

The ALJ found that Fiala met the insured status requirements of the Social Security Act through December 31, 2016, and had not engaged in substantial gainful activity since May 3, 2012, the alleged onset date of disability.  The ALJ found Fiala's bipolar/depression, obesity, degenerative disc disease, and migraine headaches to be severe impairments, but that Fiala did not have an impairment or combination of impairments that met or medically equaled the severity of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 13-20.)  The ALJ found that Fiala had the RFC to perform medium work[5] "except no more than frequent stooping, kneeling, crouching, and crawling; with need to avoid reaching over shoulder height, climbing ropes, ladders, and scaffolds, and hazards of

---

[5] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds" and the ability to perform sedentary and light work.  20 C.F.R. §§ 404.1567(c), 416.967(c).  Light work involves "a good deal of walking or standing, or . . . sitting most of the time with some pushing and pulling of arm or leg controls."

heights; but is able to understand, remember, and carry out at least simple instructions and non-detailed tasks." (Tr. 20.) The ALJ found Fiala's RFC to preclude the performance of her past relevant work. Considering Fiala's RCF, age, education, and work skills, the ALJ found vocational expert testimony to support a finding that Fiala could perform other work as it exists in significant numbers in the national economy, and specifically, hand packager, ticket taker, and usher. The ALJ thus found Fiala not to be under a disability from May 3, 2012, through the date of the decision. (Tr. 24-25.)

## V.  Discussion

To be eligible for DIB and SSI under the Social Security Act, Fiala must prove that she is disabled. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Secretary of Health & Human Servs.,* 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). An individual will be declared disabled "only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her]

---

20 C.F.R. §§ 404.1567(b), 416.967(b).

age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. *See* 20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits her ability to do basic work activities. If the claimant's impairment(s) is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform her past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

I must affirm the Commissioner's decision if it is supported by substantial

evidence on the record as a whole. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). Substantial evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion. *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001). Determining whether there is substantial evidence requires scrutinizing analysis. *Coleman v. Astrue*, 498 F.3d 767, 770 (8th Cir. 2007).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, I must review the entire administrative record and consider:

1. The credibility findings made by the ALJ.

2. The plaintiff's vocational factors.

3. The medical evidence from treating and consulting physicians.

4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5. Any corroboration by third parties of the plaintiff's impairments.

6. The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

*Stewart v. Secretary of Health & Human Servs.,* 957 F.2d 581, 585-86 (8th Cir. 1992) (internal citations omitted). I must consider evidence which supports the

Commissioner's decision as well as any evidence which fairly detracts from the decision. *McNamara v. Astrue*, 590 F.3d 607, 610 (8th Cir. 2010). If, after reviewing the entire record, it is possible to draw two inconsistent positions and the Commissioner has adopted one of those positions, I must affirm the Commissioner's decision. *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012). I may not reverse the Commissioner's decision merely because substantial evidence could also support a contrary outcome. *McNamara*, 590 F.3d at 610.

Fiala's challenges to the ALJ's decision involve the manner and method by which the ALJ determined her RFC. Specifically, Fiala claims that the ALJ improperly substituted her own opinion for the medical evidence of record, including evidence from Fiala's treating physicians. Fiala also claims that the ALJ's RFC assessment was not based on substantial evidence, which thereby led to an improper hypothetical being posed to the vocational expert. For the following reasons, Fiala's arguments are well taken, and the matter will be remanded for further proceedings.

A claimant's RFC is the most she can do despite her physical or mental limitations. *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004). The ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description

of her symptoms and limitations. *Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005); *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. § 416.945(a). Because a claimant's RFC is a medical question, some medical evidence must support the ALJ's RFC determination. *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010); *Eichelberger*, 390 F.3d at 591; *Hutsell v. Massanari*, 259 F.3d 707, 711-12 (8th Cir. 2001). The ALJ must therefore "consider at least some supporting evidence from a [medical professional]" and should obtain medical evidence that addresses the claimant's ability to function in the workplace. *Hutsell*, 259 F.3d at 712 (internal quotation marks and citation omitted). An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. *Id.*

When determining a claimant's RFC, the ALJ must evaluate the credibility of the claimant's subjective complaints. *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007); *Tellez v. Barnhart*, 403 F.3d 953, 957 (8th Cir. 2005). In so doing, the ALJ must consider all evidence relating thereto, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. *Halverson v. Astrue*, 600 F.3d 922, 931 (8th Cir. 2010); *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history

omitted).  When rejecting a claimant's subjective complaints, the ALJ must make

an express credibility determination detailing her reasons for discrediting the

testimony.  *Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012); *Cline v.

Sullivan*, 939 F.2d 560, 565 (8th Cir. 1991).

Here, after finding at Step 3 of the sequential analysis that Fiala's

impairments did not meet the criteria for listing level disability, the ALJ

determined Fiala's credibility and assessed her RFC.  In discrediting Fiala's

complaints, however, the ALJ improperly substituted her own opinion for the

medical evidence of record.  I note specifically that when addressing

Fiala's complaints as they relate to her back impairment, the ALJ referred only to

evidence that Fiala has a mild disc bulge of the thoracic spine and stated that

"objective diagnostic test results show very little to support her back pain

complaints . . . ; but nothing to justify all the treatment (medication and injections)

that she received."  (Tr. 22.)  Not only is this a factual misstatement of the

evidence, but it also demonstrates a misapprehension of Fiala's chronic pain

condition.

First, with respect to objective diagnostic tests, the record shows that while a

February 2014 MRI showed a mild disc bulge of the thoracic spine as noted by the

ALJ, numerous other diagnostic tests showed other spinal abnormalities, and

specifically:  a May 2012 MRI that showed disc herniation of the thoracic spine

resulting in ventral cord flattening and indentation; a May 2012 MRI that showed circumferential disc bulge of the cervical spine resulting in moderate foraminal stenosis; May 2013 x-rays that showed mild degenerative changes of the cervical spine; a June 2013 MRI that showed disc herniation of the cervical spine correlating to right radiculopathy; September 2013 x-rays that showed facet degeneration of the lumbar spine; and a February 2014 MRI that showed joint hypertrophy of the lumbar spine with disc bulge. This extensive evidence runs counter to the ALJ's allusion that objective diagnostic tests showed only mild disc bulge of the thoracic spine and, further, failed to justify her treatment. Where alleged inconsistencies upon which an ALJ relies to discredit a claimant's subjective complaints are not supported by and indeed are contrary to the record, the ALJ's ultimate conclusion that the claimant's symptoms are less severe than she claims is undermined. *Baumgarten v. Chater*, 75 F.3d 366, 368-69 (8th Cir. 1996).

In addition, the record shows that Fiala was referred to a pain specialist as early as February 2003 and that she regularly saw her primary care physicians during the relevant period for chronic back pain, for which she was continually prescribed significant pain medication and muscle relaxants – which ultimately included morphine and hydrocodone – in increasing dosages. Fiala was again referred to a pain specialist in May 2013 in response to her continued complaints

of significant and chronic pain.  Upon examination by this pain specialist, Fiala was diagnosed with post-laminectomy syndrome with radiculopathy, whereupon she began receiving epidural steroid injections and even higher dosages of her already-strong pain medication.  Notably, Fiala had previously been diagnosed with post-laminectomy syndrome and myofascial pain during a March 2013 independent medical examination for worker's compensation.  Post-laminectomy syndrome is diagnosed in persons who have

> [o]ngoing pain symptoms of at least 12 months duration post completion of definitive surgical procedure such as discectomy, laminectomy, fusion, etc., provided medical records indicate that pain is primary factor limiting performance of activities and focus of medical care is toward controlling/relieving pain.  Medical records should document there has been ongoing medical care and attempts to identify and treat the source of pain.  Such attempts should include appropriate diagnostic studies and consultations.

Postlaminectomy Syndrome:  ICD-9-CM Code 722.8, https://www.bwc.ohio.gov/ infostation/content/4/4.2/4.2.4.2.5.htm (last visited Mar. 8, 2017).

Despite the extensive diagnostic evidence of record showing multiple abnormalities of the spine, as well as diagnoses of post-laminectomy syndrome, chronic pain, and myofascial pain rendered by treating and examining physicians, the ALJ found that there was "nothing to justify all the treatment (medication and injections) that [Fiala] received."  (Tr. 22.)  An ALJ may not "play doctor" and substitute her opinion for that of a medical professional.  *See Pate-Fires v. Astrue*, 564 F.3d 935, 946-47 (8th Cir. 2009) (citing *Rohan v. Chater*, 98 F.3d 966, 970

(7th Cir. 1996)); *Ness v. Sullivan*, 904 F.2d 432, 435 (8th Cir. 1990). But that is what the ALJ did here. An "ALJ's reliance on . . . [her] own beliefs as to what the medical evidence should show do[es] not constitute substantial evidence" to support a conclusion that a claimant has the RFC to perform work-related activities. *Fowler v. Bowen*, 866 F.2d 249, 252 (8th Cir. 1989).

No medical report of record suggests that Fiala had not been pursuing a valid course of treatment for her pain. Nor have any of her treating physicians questioned the severity of her chronic pain impairment. Indeed, descriptions of the location and severity of Fiala's pain and the escalating treatment rendered therefor appear to place Fiala's impairment squarely within the parameters of her diagnosed condition of post-laminectomy syndrome. The ALJ erred when she discredited Fiala's complaints based on her own subjective belief of what the medical evidence should have shown. *See Tate v. Apfel*, 167 F.3d 1191, 1197-98 (8th Cir. 1999).

Where an ALJ makes a faulty credibility determination, the resulting RFC is called into question because it does not include all of the claimant's limitations. *See Holmstrom v. Massanari*, 270 F.3d 715, 722 (8th Cir. 2001). *See also Fredrickson v. Barnhart*, 359 F.3d 972, 976 (8th Cir. 2004) ("Subjective complaints . . . are often central to a determination of a claimant's RFC."). This is especially true where, as here, substantial evidence of record shows a possible

relationship between a claimant's level of pain and the severity of her mental impairment. *See Delrosa v. Sullivan*, 922 F.2d 480, 485-86 (8th Cir. 1991) (citing *Chitwood v. Bowen*, 788 F.2d 1376, 1378 (8th Cir. 1986); *Herbert v. Heckler*, 783 F.2d 128, 131 (8th Cir. 1986)). The matter must therefore be remanded for reconsideration of Fiala's credibility and for a more complete review of the record. *Baumgarten*, 75 F.3d at 368-69.

Further, a review of the ALJ's RFC analysis *in toto* shows it to consist only of discrediting Fiala's subjective complaints as well as discounting the opinions of Dr. Volarich and Psychologist Stock. Other than discrediting Fiala's subjective complaints and this opinion evidence of record, the ALJ engaged in no discussion or analysis of any evidence as it relates to Fiala's RFC, that is, what she is able to do despite her impairments.[6] Drawing a conclusion regarding credibility is not equivalent to demonstrating by medical evidence that a claimant has the RFC to perform certain work-related activities. *Estabrook v. Apfel*, 14 F. Supp. 2d 1115, 1122 (S.D. Iowa 1998), *cited approvingly in Patton v. Colvin*, No. 2:14CV47 ACL, 2015 WL 3548823, at *17 (E.D. Mo. June 8, 2015) (memorandum and order).

---

[6] To the extent Fiala argues that the ALJ erred by not discussing the weight accorded to the opinion of a State agency examiner who completed a Physical RFC Assessment, I note that this Assessment was completed by a non-medical single decision maker. (*See* Tr. 60-62.) A single decision maker is not an "acceptable medical source" under the Regulations and thus cannot be considered a State agency medical consultant whose opinion must be considered and weighed by an ALJ in determining a claimant's RFC. 20 C.F.R. §§ 404.1616(b), 416.1016(b); SSR 96-6p, 1996 WL 362203, at *4 (July 2, 1996).

Instead, the ALJ's RFC assessment must discuss and describe how the evidence *supports* each conclusion and must cite specific medical facts and nonmedical evidence in doing so, as well as resolve any material inconsistencies or ambiguities in the evidence of record. SSR 96-8p, 1996 WL 374184, at *7 (July 2, 1996). The ALJ did not undergo this process here. Indeed, she wholly failed to discuss or analyze any evidence as it related to what Fiala *is able to do* despite her impairments. In the absence of any thoughtful discussion or analysis by the ALJ, I would be required to weigh the evidence in the first instance or review the factual record *de novo* in order to find the ALJ's RFC assessment to be supported by substantial evidence on the record as a whole. This I cannot do. *See Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994).

Because the ALJ's RFC assessment is not supported by substantial evidence on the record as whole, the hypothetical question posed to the vocational expert that was based on this RFC was incomplete. A vocational expert's opinion that is based on a hypothetical question that does not encompass all relevant effects of a claimant's impairments cannot constitute substantial evidence to support an ALJ's decision. *Renstrom,* 680 F.3d at 1067; *Jones v. Astrue*, 619 F.3d 963, 972 (8th Cir. 2010).

With the ALJ's erroneous credibility determination and lack of analysis regarding the consistent medical evidence of record demonstrating Fiala's serious

limitations caused by her physical and mental impairments, it is not clear as to what medical evidence, if any, the ALJ relied on to conclude that Fiala could perform medium work and was mentally limited only with regard to performing simple, non-detailed tasks. Because the ALJ's decision is unclear as to the medical basis for her assessment of the degree to which Fiala's impairments affect her RFC, I must remand the matter to the Commissioner for further proceedings. *Lauer v. Apfel*, 245 F.3d 700, 704-05 (8th Cir. 2001).

Upon remand, the Commissioner shall obtain and provide the parties an opportunity to submit additional medical evidence that addresses Fiala's ability to function in the workplace, which may include contacting Fiala's treating physical and mental health care providers to clarify her limitations and restrictions in order to ascertain what level of work, if any, she is able to perform. *See Coleman v. Astrue*, 498 F.3d 767 (8th Cir. 2007); *Smith v. Barnhart*, 435 F.3d 926, 930-31 (8th Cir. 2006). The medical evidence that was submitted to and rejected by the Appeals Council may also be considered. The ALJ is also permitted to order additional examinations and tests in order for her to make an informed decision regarding the extent to which Fiala's physical and mental impairments, both severe and non-severe, affect her ability to perform work-related activities. *Dozier v. Heckler*, 754 F.2d 274, 276 (8th Cir. 1985); 20 C.F.R. §§ 404.1517, 416.907. Upon receipt of any additional evidence, the ALJ shall reconsider the record as a

whole, reevaluate the credibility of Fiala's own description of her symptoms and limitations, and reassess Fiala's RFC – including the extent to which her RFC is affected by medication side effects. *See Owen v. Astrue*, 551 F.3d 792, 802 (8th Cir. 2008). Such reassessed RFC shall be based on some medical evidence in the record and shall be accompanied by a discussion and description of how the evidence supports each RFC conclusion. *Cox v. Astrue,* 495 F.3d 614, 619 (8th Cir. 2007).

Although the record strongly suggests that the combination of Fiala's severe impairments render her disabled, I cannot conclusively say that she is. The Commissioner may make this determination after proper consideration of the evidence of record.

Therefore,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED**, and this cause is **REMANDED** for further proceedings.

A separate Judgment in accordance with this Memorandum and Order is entered this same date.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 13th day of March, 2017.